IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VICKIE D. BROWN, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-2299 |
| | § | |
| MICHAEL ASTRUE, | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court in this appeal from a denial of Social Security disability benefits are Plaintiff's Motion for Summary Judgment (Docket Entry No. 10) and Defendant's Motion for Summary Judgment (Docket Entry No. 11). The Court, having considered the motions, all relevant filings, and the applicable law, **GRANTS** Defendant's motion for summary judgment (Docket Entry No. 11), **DENIES** Plaintiff's motion for summary judgment (Docket Entry No. 10), and **AFFIRMS** the Commissioner's decision.

## I.   CASE BACKGROUND

### A.   Procedural Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration (the "Commissioner") regarding her claims for disability benefits under Title II of the Social Security Act ("the Act").

Plaintiff filed her application for disability insurance benefits in September 2004, alleging a disability onset date of June 1, 1993.  Tr. 71.  At a hearing held on August 8, 2007, the administrative law judge (the "ALJ") heard testimony from Plaintiff, a medical expert (the "ME"), and a vocational expert (the "VE").  Tr. 294-335.  In his decision issued on November 30, 2007, the ALJ found that Plaintiff was not disabled.  Tr. 28.

The Appeals Council denied Plaintiff's request for review.  Tr. 5-7.  Accordingly, the ALJ's decision became the Commissioner's final decision for purposes of this Court's review.

## B.    Factual Background

At the hearing held on August 8, 2007, Plaintiff testified that she was forty years old and  had a college degree in business management.  Tr. 299.  She last worked in November 1994 as a claims representative and teleservice representative for the Social Security Administration.  Tr. 300.  She was diagnosed with lupus[1] in 1993, which became severe in 1995.  Tr. 301.  She stated that it causes her to have arthritis-like symptoms such as joint pain

---

[1]" Systemic lupus erythematosus (SLE) is a chronic inflammatory disease that can affect any organ or body system.  It is frequently, but not always, accompanied by constitutional symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss). Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ('lupus fog'), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis).  Immunologically, there is an array of circulating serum auto-antibodies and pro- and anti-coagulant proteins that may occur in a highly variable pattern." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00D(1)(a).

and finger deformities, with knee, ankle, and hip pain and inflammation. *Id.* According to Plaintiff, a rheumatologist recommended that she stop working in 1995 because work stress was causing her condition to flare. The flare-ups caused joint pain and left her weak, fatigued, and unable to concentrate fully. *Id.*

Plaintiff stated that the symptoms affected her on a daily basis, leaving her unable to work productively for more than an hour without needing to rest for two hours. Tr. 302. Her nephrologist in 1998 suggested that she take naps throughout the day to prevent flare-ups. She still has these limitations, although her condition has worsened over time. Tr. 303. She takes Plaquenil for the lupus, but she is limited in how much she can take because it is known to cause vision problems. *Id.* On "really bad" days, the lupus would leave her bedridden and unable to walk because of the joint and chest pain. Tr. 304. From 1996 through 2000, some flare-ups left her bedridden for days. She testified that she knows when a flare-up is beginning because her joints become inflamed and painful; she then rests to avoid a major flare-up. Tr. 305. She stated that about four times per week she experiences the beginnings of a flare-up, requiring her to rest to avoid a full flare-up. Since 1995, she has had at least one full flare-up per month. Tr. 306. She can remain on her feet for twenty to thirty minutes before needing two hours' rest. Tr. 307. Sitting causes backaches and leg pain, which requires her to rest. *Id.* She can normally lift ten pounds, but cannot lift anything during a flare-up. Tr. 308.

Plaintiff further testified that, from 1995 through 2000, she would do limited housework for an hour then rest to avoid a flare-up.  Tr. 309.  She also has antiphospholipid syndrome (APS)[2] related to poor circulation, but stated that it causes no physical limitations distinct from the lupus.  Tr. 310.  In November 2004 she was diagnosed with breast cancer, which was treated with a lumpectomy and radiation.  She stated she takes Tamoxifen, a chemotherapy-like drug.  Tr. 311.  She stated she has very limited use of her upper right side due to the surgery, but can grasp and manipulate things without causing pain.  Tr. 312.  With flare-ups, she cannot grasp things or use her hands.  Tr. 313.  As of the hearing, she was taking Hyzaar (for high blood pressure), Plaquenil (for the lupus), Tamoxifen, potassium pills, and iron supplements.  The Tamoxifen leaves her fatigued and nauseous and she sometimes has blurred vision when tired.  Tr. 314.

Plaintiff described herself as a "stay-at-home mom" to her two children.  Tr. 315.  Her husband was employed full time.  Plaintiff testified that she can drive a car, grocery shop, do laundry, dishes and some cooking, but requires outside help with housework.  Tr. 316.  She last used steroids for the lupus about a year ago.  Tr. 320.

The medical expert testified that, based on his review of the available medical records, there was a fairly high medical probability that Plaintiff had lupus.  *Id*.  Her breast cancer was

---

[2]Antiphospholipid syndrome is " a multisystem inflammatory disorder characterized by the presence of circulating antiphospholipid antibodies and by thrombosis and vascular occlusion, spontaneous abortion, thrombocytopenia, valvular heart disease, and other less frequent symptoms." *Dorland' s Illustrated Medical Dictionary*, 30th ed. (2003) at 1810.

surgically treated with adjunctive radiation, with no evidence of recurrence. *Id*. The ME was not familiar with APS, but he stated that the medical records did not reference a circulatory problem. Tr. 321. Her physicians were treating her pleurisy as related to the lupus, and were apparently treating the lupus as a smoldering-type lupus. Tr. 322-24. The ME testified that Plaintiff's joint pain would be related to the lupus, but he saw no objective data in the medical records to support any neuropathy. *Id*. The ME was of the opinion that Plaintiff did not meet or equal a listed impairment:

> I'd consider the lupus under 14.02, and I, my opinion there is that at no time that the records that I had access to was there sufficient level of systemic involvement in one system or sufficient level in two systems. Rather this appeared to me to be, if lupus, probably a smoldering, low-grade lupus. And I note also that there was none of the more typical remissions and exacerbations of lupus. The treating physicians will have to pulse the steroids for periods of weeks or sometimes months, but that was not done in this case.

Tr. 325. The ME was of the opinion that Plaintiff should remain at a sedentary level[3] of work, and that her sedentary level would extend as far back as the mid-1990s when the condition was first discovered. Tr. 326. He emphasized that hers was a "smoldering" lupus:

> To give you a little bit of explanation, that it, [lupus] can be highly variable. It can be acute, [f]ulminating, progressive, right on to deaths. More frequently it will have remissions and exacerbations. And when we medically talk about remissions and exacerbations we're usually talking about the, the type of clinical picture where all the tests are up markedly, the patient becomes very,

---

[3]Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying certain articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

very ill for weeks, months at a time.  The treating physicians have to pulse the steroids, put [the patient] on higher doses for that period of time.  And the picture here to me, on a medical opinion of it is that if this is lupus, and I think high probability it is, it's, it's been more low-grade smoldering and not going through the course.

Tr. 327.  The ME stated that Plaintiff's condition did not reflect true exacerbations or flare-ups, but rather, incidents of her overstepping her activity level and becoming more symptomatic for a few days.  He was of the opinion that keeping her at a sedentary level – "no more than sedentary" – would prevent exacerbations of her symptoms.  Tr. 328.  Specifically, the ME reported that, "I think she'd probably tolerate sedentary, but I don't know that."  He admitted that, even at the sedentary level, he could not discount her having the occasional flare-up, with "good days and bad days, and unscheduled absences," because "if she does too much she pays for it."  Tr. 328-29.

The vocational expert (VE) testified that Plaintiff's prior jobs were at light skilled, sedentary semi-skilled, and sedentary skilled levels.  Tr. 332.  Under the first hypothetical, the VE stated an individual such as Plaintiff could perform her past work as a claims representative and teleservice representative if she required one unscheduled absence per month.  *Id.*  Under the second hypothetical, the individual could probably perform her past work as a claims representative if she additionally required three unscheduled breaks per day for ten to fifteen minutes each.  Tr. 333.  Under the third hypothetical, however, the VE testified that the individual would have problems maintaining her past work if she also required two to three unscheduled absences per month.  *Id.*

6

Under cross-examination, the VE testified that, if the person had an additional physical restriction under the first hypothetical that would reduce her work production pace by up to a third of the average worker, it would eliminate her employability even for sedentary work.  *Id*.  It would also eliminate her employability if she were to require three unscheduled breaks per work day of twenty to twenty-five minutes each.  Tr. 334.

The ALJ issued his unfavorable decision and findings on November 30, 2007.

**C.      The ALJ's Evaluation and Findings**

The ALJ made the following findings with attendant evaluations of the medical evidence:

(1)      Plaintiff last met the insured status requirements of the Act on December 31, 2000.  Tr. 23.

(2)      Plaintiff has not engaged in substantial gainful employment since June 1, 1993, the alleged date of onset, through her date last insured of December 31, 2000.  *Id*.

(3)      Through the date last insured, Plaintiff had the severe impairments of systemic lupus erythematosus (SLE) and essential hypertension.  Tr. 24.

The ALJ noted that Plaintiff's prior breast cancer was not a severe impairment, as the medical records showed no residuals from the condition and treatment.  He further noted that her APS, affective mood disorder, anxiety disorder, and neuropathy were not medically determinable impairments as there were no objective clinical and laboratory findings to support such diagnoses.  *Id.*

(4)     Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  *Id*.

In reaching this conclusion, the ALJ expressly relied on the ME's testimony that Plaintiff's physical impairments did not meet or medically equal a listed impairment.  *Id*.

(5)     Plaintiff had the residual functional capacity (RFC) to perform sedentary work, or work which is generally performed while sitting frequently (more or less six hours in an eight-hour workday), standing or walking occasionally (more or less two hours in an eight-hour workday), and does not require lifting in excess of ten pounds occasionally, five pounds frequently.  Tr. 25.

The ALJ stated that, in her disability benefits application, Plaintiff alleged physical limitations in standing, walking, lifting, carrying, using her hands, bending, kneeling, squatting, climbing, reaching, driving a car, and doing housework, yard work, gardening, recreation, and personal care.  *Id*.  He referenced her reports of fatigue and weakness on a daily basis brought on by stress and overexertion not relieved by rest and pain medication, but noted she reported no physical limitations with sitting, hearing, speaking, reading the newspaper, watching television, and using the telephone.  *Id*.  She stated she walked for exercise and did housework on an average day.

The ALJ stated that, at the hearing, Plaintiff testified that she had not worked since November of 2004 due to lupus that was diagnosed in 1993, which presented with chest pains, arthritis symptoms, joint pain, fatigue, and memory and concentration problems.  She

testified to having pleurisy, joint pain, chest pain, and flare-ups, and that her physician had recommended she quit work due to job-related stress.[4]  Tr. 26.  He noted her testimony that she was unable to walk due to arthritis and joint pain, had to walk with a cane,[5] does not want to eat, stays in bed, has no strength in her hands, is unable to lift ten pounds, and does limited housework.  He further noted that she stated she can remain on her feet for twenty to thirty minutes before requiring a break of several hours, and that her medications cause fatigue, hot flashes, nausea, and visual problems.  *Id*.  The ALJ reported that, "Contrarily, she testified that she is a stay-at-home mom, does occasional cooking, laundry, and dishes (never more than one hour at a time), and has flown to North Carolina to visit family."  *Id*.

In summarizing the medical records, the ALJ opined that the objective findings failed to provide strong support for Plaintiff's allegations of disabling symptoms and limitations. Her RFC to perform the full range of sedentary work was supported by objective clinical and laboratory findings from treating and non-treating physicians and the ME.  The ALJ stated that the ME was of the opinion that Plaintiff retained the RFC to perform the full range of sedentary work based on the medical evidence and claimant's testimony regarding lupus and essential hypertension.  *Id*.  The ME testified that Plaintiff was performing activities despite exacerbations and flare-ups that would rule out any additional exertional and non-exertional

---

[4]As this physician's medical records were not submitted, it cannot be ascertained whether the physician meant that Plaintiff's particular job at that time was causing her stress, or whether her working *per se* caused the stress.

[5]Plaintiff did not testify that she required the use of a cane to ambulate.

limitations.  The ALJ further stated that the ME was of the opinion that tolerating no more than sedentary work would probably avoid exacerbations and flare-ups and that the record lacked evidence to support anything less.

The ALJ referenced a treating physician's records of February 5, 1997, which showed that Plaintiff appeared stable, and of March 27, 1997, wherein Plaintiff reported doing very well with only occasional joint aches while not taking steroids.  *Id*.  A review of Plaintiff's systems on May 18, 1998, was negative for any abnormalities.  Treatment notes dated June 15, 1998, evinced that Plaintiff had no complaints, was doing well, denied urinary symptoms, swelling, or other problems.  Plaintiff's December 2004 records from M.D. Anderson Cancer Center reflected that her lupus was inactive and that she reported having no flare-ups for the prior nine years.  In a review of systems dated September 13, 2006, Plaintiff denied neurological, cardiovascular, respiratory, gastrointestinal, genitourinary, musculoskeletal, skin, or psychological symptoms.  *Id*.  In a hospital report dated July 30, 2007, Plaintiff denied having headaches, dizziness, loss of consciousness, shortness of breath, palpitations, gastrointestinal symptoms, or numbness, joint pain, or swelling over her  lower extremities. Tr. 27.

The ALJ concluded that, based on the evidence in the record, Plaintiff's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of the symptoms were generally credible but not to the extent alleged.  *Id*.  The ALJ noted

that her alleged limited daily activities could not be objectively verified with any reasonable degree of certainty and that, even if the limitations were accurate, it was difficult to attribute the degree of limitation to Plaintiff's medical condition as opposed to other reasons, in view of the relatively weak medical evidence. The ALJ particularly relied on Plaintiff's decision to go on a family vacation as suggesting that her alleged symptoms and limitations were overstated. The ALJ also noted that she was not taking any symptom-related medications. *Id*. He noted that she had last used steroids in 2006. The ALJ was of the opinion that Plaintiff's testimony regarding the intensity and persistence of pain was not consistent with her medical records, particularly in absence of any recommendations for physical restrictions by a treating physician. *Id*.

(6)     Plaintiff's past relevant work as a customer service representative and as a claims representative did not require the performance of work-related activities precluded by her RFC.  Tr. 28.

The ALJ referred to the VE's testimony that a hypothetical individual, given the claimant's RFC, would be able to perform Plaintiff's past relevant work as a customer service representative or claims representative.  *Id*.

(7)     Plaintiff was not under a disability from June 1, 1993, the alleged onset date, through December 31, 2000, the date last insured.  *Id*.

## II.   STANDARD OF REVIEW AND APPLICABLE LAW

A motion for summary judgment under Federal Rules of Civil Procedure Rule 56 requires the Court to determine whether the moving party is entitled to summary judgment as a matter of law based on the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001).  A genuine issue of material fact exists if a reasonable fact finder could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).  The Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Id*.

Judicial review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether substantial evidence in the record supports the decision and whether the ALJ applied proper legal standards in evaluating the evidence. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).  If the Commissioner's decision satisfies both of these requirements, it must be affirmed.  *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

### A.    "Substantial Evidence"

The widely-accepted definition of substantial evidence is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id.* It is "something more than a scintilla but less than a preponderance." *Id.* The Commissioner has the responsibility of deciding any conflict in the evidence. *Id.* If the findings of fact contained in the Commissioner's decision are supported by substantial evidence appearing in the record, they are conclusive, and this Court must affirm. 42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the Court overturn it. *See Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the Court is to review the entire record, but may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Brown*, 192 F.3d at 496. In other words, the Court is to defer to the Commissioner's decision as much as possible without making its review meaningless.

### B.    Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving that he is disabled within the meaning of the Act. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); *see also Greenspan v. Shalala*,

38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings.  42 U.S.C. § 423 (d)(3).  A claimant is eligible for benefits only if the onset of the qualifying medical impairment began on or before the date the claimant was last insured.  *Ivy v. Sullivan*, 898 F.2d 1045, 1948 (5th Cir. 1990).

To determine whether a claimant is capable of performing any substantial gainful activity, the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

(1)     a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are;

(2)     a claimant will not be found to be disabled unless he has a 'severe impairment';

(3)     a claimant whose impairment meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors;

(4)     a claimant who is capable of performing work that he has done in the past must be found 'not disabled'; and

(5)     if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and residual functional capacity must be considered to determine whether he can do other work.

*Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).  By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears the burden of proof on the fifth step.  *Crowley v. Apfel*, 197 F.3d 194, 198 (5th Cir. 1999);

*Brown*, 192 F.3d at 498.  The Commissioner can satisfy his burden either by reliance on the Medical-Vocational Guidelines of the Regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  If the Commissioner satisfies his burden of proof as to the fifth step, then the burden shifts back to the claimant to prove he cannot perform the work suggested.  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.  *Greenspan*, 38 F.3d at 236.

### III.   ANALYSIS

Plaintiff complains that the ALJ erred in rejecting her claim of a listed impairment; in failing to consider her medication side effects; and in finding a residual functional capacity for sedentary work.  (Docket Entry No. 10.)

### A.    Listed Impairment

The ALJ rejected Plaintiff's argument that her lupus met or equaled a listed impairment.  In her motion for summary judgment, Plaintiff argues, *inter alia*, that the ALJ erred in reaching this decision because he failed to consider all of the evidence in the record.

The criteria for lupus as a listed impairment are found in 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 14.02.  Plaintiff refers the Court to the criteria of that provision as it existed at the time of the hearing in 2007.  Defendant, on the other hand, refers the Court to the current, modified provision, but argues that Plaintiff fails to meet the criteria of either version.

Listing 14.02 (as it was in effect at the August 2007 hearing) provided two options by which the listing could be met, either under paragraph A or paragraph B.  The listing provided as follows:

14.02 Systemic lupus erythematosus.  Documented as described in 14.00(B)(1),[6] with:

A.    One of the following:

1.    Joint involvement, as described under the criteria in 1.00; or

2.    Muscle involvement, as described under the criteria in 14.05; or

3.    Ocular involvement, as described under the criteria in 2.00ff; or

4.    Respiratory involvement, as described under the criteria in 3.00ff; or

5.    Cardiovascular involvement, as described under the criteria in 4.00ff or 14.04D; or

6.    Digestive involvement, as described under the criteria in 5.00ff; or

7.    Renal involvement, as described under the criteria in 6.00ff; or

8.    Hematologic involvement, as described under the criteria in 7.00ff; or

9.    Skin involvement, as described under the criteria in 8.00ff; or

10.   Neurological involvement, as described under the criteria in 11.00ff; or

11.   Mental involvement, as described under the criteria in 12.00ff.

---

[6]Section 14.00(B)(1) describes the disease as " characterized clinically by constitutional symptoms and signs (*e.g.*, fever, fatigability, malaise, weight loss), multisystem involvement and, frequently, anemia, leukopenia, or thrombocytopenia."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00(B)(1).

Or

    B.    Lesser involvement of two or more organs/body systems listed in paragraph A, with significant, documented, constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss.  At least one of the organs/body systems must be involved to at least a moderate level of severity.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.02.

Defendant asserts that Listing 14.02, in its current version, provides as follows:

14.02  Systemic lupus erythematosus.  As described in 14.00(D)(1).  With:

    A.    Involvement of two or more organs/body systems, with:

    1.    One of the organs/body systems involved to at least a moderate level of severity; and

    2.    At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

Or

    B.    Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

    1.    Limitation of activities of daily living.

    2.    Limitation in maintaining social functioning.

    3.    Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

*See* Revised Medical Criteria for Evaluating Immune System Disorders, 73 Fed. Reg. 14570

(March 18, 2008), *codified* at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.02 (2009).  Notably,

the current version of the Listings no longer directs the ALJ to look beyond Listing 14.02 to make a determination. Moreover, to meet Listing 14.02A or B, an individual need not establish all four constitutional symptoms or signs as previously required. Indeed, a claimant need only establish that he or she experiences two of the four symptoms. However, because the instant hearing took place prior to this modification of the criteria, and the ALJ utilized the then-current criteria, this Court will review the ALJ's determinations under the listing provisions in effect at the time relevant to those determinations. Neither party presents any argument or authority that this Court should apply the revised criteria to the instant review.

Plaintiff argues that the ALJ's finding against lupus as a listed impairment is not supported by substantial evidence. This Court is compelled to disagree. Listings criteria are "demanding and stringent," and the mere diagnosis of a condition will not suffice. *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994). Under Sections 404.1525(d) and 416.925(d), the claimant must have a medically determinable impairment that satisfies all of the criteria in the listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). The burden of proof rests with a claimant to provide and identify medical signs and laboratory findings that support all criteria for a step three listing determination. *Id.*

If an impairment does not meet a listing, it may, nevertheless, entitle the claimant to a finding that he is disabled if his impairment or combination of impairments is medically equivalent in severity to the listing. *See* Sections 404.1526, 416.926. If the claimant argues

18

for medical equivalency, the standard is similarly demanding, and the claimant may not establish listings-level severity through subjective testimony.  Rather, the claimant must point to objective medical findings that support each of the criteria for the equivalent impairment determination.  *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).

In the instant case, the ALJ rejected a listed or equivalent impairment based on the testimony of the ME, who stated that Plaintiff's physical impairments did not meet or medically equal the level of severity contemplated for any listed impairment.  Plaintiff disagrees with that analysis, and argues that she meets the listing because she was diagnosed with and treated for SLE and experienced joint, muscle, ocular, cardiovascular, renal, and mental involvement.  In support, she references the following:  treatment for lupus from November 1997 through November 2000, with manifestations of anemia, proteinuria, Raynaud's phenomenon, serositis, sicca symptoms, and hypocomplementemia. Tr. 159-163.  However, as Defendant correctly argues, these "involvements" or "manifestations" of symptoms are without supporting laboratory or clinical data and do not, standing alone, meet or equal the criteria for any particular system under Paragraph A or the required involvement and severity of two systems under Paragraph B.

To the contrary, Plaintiff's treatment records show that she was reported "[d]oing well, no complaints" in December 1995 and January 1996. Tr. 138.  In June and October of 1996, her high blood pressure was "well controlled" and she was "doing well" except for two limited instances of minor swelling and occasional joint discomfort.  Tr. 137.  In March of

1997, Plaintiff was reportedly "[d]oing very well, no complaints except occasional joint aches." Tr. 136. Her nephrologist reported no significant symptoms in May 1998. Tr. 142, 147. Plaintiff "really ha[d] no complaints" in June 1998. Tr. 144. On January 19, 2000, Plaintiff's treating physician noted, "There is nothing to suggest activity of lupus." Tr. 147. In April of 2000, Plaintiff reported that she "really feels good," was on an exercise program, and had no joint complaints, peripheral edema, or other major problems. Tr. 151.

Plaintiff further argues that she meets the criteria for renal involvement because proteinuria (the presence of protein in urine) appears throughout her medical records and the ME testified that proteinuria was indicative of a "sufficient" level of kidney involvement. Tr. 134, 137-139, 141, 143-44, 146, 149 159-163, 325. The ME, however, was not of the opinion that *Plaintiff's* medical records were indicative of a sufficient level of renal involvement regarding lupus. To the contrary, he testified regarding Plaintiff's proteinuria that, "[T]here's enough kidney involvement from *something* that she's spilling protein in the urine." Tr. 325 (emphasis added). He did not state that Plaintiff's lupus was the "something" causing her proteinuria, and was not of the opinion that her physician's notation of "interstitial-range proteinuria" indicated lupus-related renal involvement:

> I don't know what they mean by the word interstitial. He may mean that there's not enough glomerular damage, or doesn't suspect that there's a lot of glomerular damage and then maybe there's some profusion abnormality. I don't know really what he's driving at.

*Id*.

Plaintiff also references her decreased levels of potassium and magnesium, which she states the ME indicated were the result of a "sufficient" level of renal involvement.  Tr. 323.  Again, the ME did not testify that *Plaintiff's* medical records indicated decreased potassium and magnesium levels or that she evinced a lupus-induced electrolyte imbalance.  *Id*.  Indeed, Plaintiff's own treating physician found her renal function to be normal.  Tr. 145-46.

Plaintiff also points to having pleuritic chest pain during flare-ups, and blood pressure that remained uncontrolled.  Tr. 129-131, 141-142, 147, 149, 300, 315.  She complained of arthritis-like joint pain and inflammation of her knees, ankles, hips, and fingers.  Tr. 94, 134, 141, 137, 142, 300-301, 303-304.  Plaintiff further notes that she had inflammation of her feet with pain and swelling, and that pain caused memory and concentration problems, headache, fatigue, weakness, and loss of energy.  Tr. 142, 147, 149, 301, 303, 306, 307, 313-14.  The ME, however, testified that these conditions did not meet or equal a Listing.

Although Plaintiff unquestionably experienced many of the expected signs and symptoms of lupus, a careful review of the record shows that the ALJ's finding that she did not meet or equal Listing 14.02 is supported by substantial evidence.  No error is shown.

### B.    Medication Side Effects

Plaintiff contends that the ALJ failed to consider all of the evidence in the record pertaining to side effects caused by her medications.  (Docket Entry No. 10, p. 5.)  She argues that, because the ALJ did not consider Plaintiff's reported medication side effects in his disability determination, clear error is shown.

21

The ALJ must take into account the effects of medication on a claimant's ability to perform work tasks. *Loza v. Apfel*, 219 F.3d 378, 396-97 (5th Cir. 2000). In his decision in the instant case, the ALJ noted that, "[Plaintiff] also testified that her prescription medications cause fatigue, hot flashes, nausea, and visual problems."[7] Tr. 26. Plaintiff testified at the hearing that she had been taking Plaquenil for her lupus since 1995, and tries not to increase her dosage because "it can affect your vision." Tr. 303. She stated that she undergoes a visual field test on an annual basis "to make sure it's not affecting my vision." Tr. 314. Plaintiff acknowledged having occasional blurred vision following prolonged reading or computer use, but attributed it to her lupus, not her medication. *Id*. Accordingly, Plaintiff reported no relevant side effects regarding her Plaquenil. She also reported having fatigue, nausea, and hot flashes from her cancer medication (Tamoxifen), but she did not start taking that drug until 2005, which was after expiration of her insured status. Tr. 197-98, 313.

Accordingly, Plaintiff did not report any relevant functional loss or disability occasioned by her medications, and no error is shown.

## C.    Credibility

Plaintiff complains that the ALJ improperly evaluate her credibility. (Docket Entry No. 10, p. 6.) Although the ALJ did not make a specific affirmative finding that Plaintiff was not a credible witness, he did state that her alleged limited daily activities were not subject

---

[7]Plaintiff testified that one of her medications, Plaquenil, can cause vision problems. Tr. 303, 313. She did not, however, testify that it had caused her any vision problems.

to objective verification with any reasonable degree of certainty and that, even assuming the limitations were valid, only relatively weak medical evidence attributed those limitations to her lupus as opposed to other reasons.[8]   Tr. 27.   The ALJ heavily relied on Plaintiff's vacation as suggesting that her alleged symptoms and limitations may have been "overstated."   *Id*.   He also looked to the fact that, despite her claim of daily disabling symptoms, she had not taken any medications for those symptoms, particularly any steroids, for over a year.   *Id*.   He further discounted the reliability of her information, as the alleged intensity and persistence of her pain and limitations were not consistent with her medical records and laboratory findings.   *Id*.   These were appropriate determinations in light of the record as a whole.   *See Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989) (holding that subjective complaints must be supported by objective evidence); *Hollis v. Bowen*, 837 F.2d 1378, 1384-85 (5th Cir. 1988) (holding that negative physical examination results and lack of objective factors supporting subjective complaints are properly considered in determining credibility).

An ALJ's credibility determinations are generally entitled to great deference.   *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000).   The ALJ is entitled to determine the credibility

---

[8]For example, in June of 2007, Plaintiff's cardiologist reported that, " Given her symptoms of fatigue and some shortness of breath on exertion and sinus tachycardia, either her symptoms could be because of hypothyroidism or anemia.   Advised her to follow up with her primary care physician to have her [thyroid levels] checked along with hemoglobin and hematocrit."   Tr. 281.   He also recommended a potassium-level check, as she was taking hydrochlorothiazide.   *Id*.

of medical experts as well as lay witnesses and weigh their opinions accordingly. *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994).  Under the record reviewed by this Court, it cannot be said that the ALJ's determinations of Plaintiff's credibility constituted error.

### D.   Residual Functional Capacity

The ALJ determined that, through December 31, 2000, Plaintiff had a RFC to perform the full range of sedentary work, or work which is generally performed while sitting frequently (six out of eight hours), standing or walking occasionally (two out of eight hours) and does not require lifting in excess of ten pounds occasionally and five pounds frequently. Tr. 24.  Plaintiff disagrees, and asserts that the record shows she cannot perform the demands of sedentary work.  (Docket Entry No. 10, p. 7.)

An individual's RFC is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  It is defined as "the most you can still do despite your limitations."  20 C.F.R. § 404.1545(a)(1).  In making a determination of RFC, the ALJ must consider all of the claimant's impairments, including impairments that are not severe.  20 C.F.R. § 404.1520(e).

In asserting that she is incapable of performing sedentary work, Plaintiff relies on her own subjective allegations of physical limitations.  As noted by the ALJ in his written decision, however, the intensity, persistence, and limiting effects of the impairments Plaintiff reported at the hearing and in her filings are not supported by the objective medical evidence. In response to the ALJ's questioning regarding Plaintiff's abilities, the ME testified that

Plaintiff's lupus was a low-grade smoldering-type rather than one with genuine months and year-long exacerbations and remissions.  Tr. 325.  He stated that Plaintiff experiences what she calls "flare-ups" that are exacerbations of her symptoms that require her to rest following over-exertion.  Tr. 326.  He was of the opinion that her lupus was not going "through the course" of exacerbations and remissions.  Tr. 327.

As previously noted, Plaintiff's treatment records show that she was reported "[d]oing well, no complaints" in December 1995 and January 1996.  Tr. 138.  In June and October of 1996, her high blood pressure was "well controlled" and she was "doing well" with her lupus symptoms except for two limited instances of minor swelling and occasional joint discomfort.  Tr. 137.  In March of 1997, Plaintiff was reportedly "[d]oing very well, no complaints except occasional joint aches."  Tr. 136.  Her nephrologist reported no significant symptoms in May 1998.  Tr. 142, 147.  Plaintiff "really ha[d] no complaints" in June 1998.  Tr. 144.  On January 19, 2000, her treating physician noted "There is nothing to suggest activity of lupus."  Tr. 147.  In April of 2000, Plaintiff reported that she "really feels good" and that she was on an exercise program.  She denied any joint complaints, peripheral edema, or other major problems.  Tr. 151.  The ALJ compared these medical record notations to Plaintiff's testimony at the hearing of having disabling flare-ups four times a week and needing to rest two hours for every one hour of physical activity.  The ALJ did not fully accept Plaintiff's subjective reports of these physical limitations, as they were  unsupported,

if not refuted, by the medical records.   In short, the record as a whole does not show that Plaintiff is unable to perform the demands of sedentary work.

Based on a careful review of the record, the Court finds that the ALJ's determination regarding Plaintiff's RFC is supported by substantial evidence, and no error is shown.

### E.  Past Relevant Work

Plaintiff asserts that the ALJ failed to make a specific determination that she can perform her past relevant work on a regular and continuing basis and maintain employment for a significant period of time.  (Docket Entry No. 10, pp. 8-9.)  Related to this is Plaintiff's assertion that the ALJ failed to consider the fact that lupus is an impairment that "waxes and wanes."  *Id*., p. 9.

Disability determinations turn on whether applicants can perform substantial gainful activity.  Substantial gainful activity contemplates a capacity for employment on a regular and continuing basis.  *Frank v. Barnhart*, 326 F.3d 618, 621 (5th Cir. 2003).   The Commissioner's regulations require administrative adjudicators to determine RFC for work activity "on a regular and continuing basis."  20 C.F.R. § 404.1545(b).  Work on a regular and continuing basis means "8 hours a day, for 5 days a week, or an equivalent work schedule."  SOC. SEC. R. 96-8p (1996).

In absence of an express finding, reviewing courts generally assume that administrative assessments of RFC include *implicit* findings of ability to work on a regular and continuing basis.  *Frank*, 326 F.3d at 619.  Only when medical or other evidence shows

26

that symptoms caused by a severe impairment "wax and wane" is a separate, explicit finding required.  However, contrary to Plaintiff's position, allegations that an impairment causes "good days and bad days . . . simply do[es] not rise to the level of impairment anticipated by the Court in *Frank*."  *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005).

When asked in the instant case whether lupus is a condition than has exacerbations from time to time, the ME testified that lupus can be highly variable, frequently with remissions and exacerbations.   In exacerbations, he states, the tests are up "markedly" and the patient becomes "very, very ill for weeks, months at a time" and requires higher doses of steroids.  Tr. 326-27.  The ME was of the opinion that Plaintiff's condition, on the other hand, was more "low-grade smoldering and not going through the courses" of remissions and exacerbations.  Tr. 327.  He did not believe Plaintiff was experiencing actual flare-ups or exacerbations, but rather, would become symptomatic for a few days when she "oversteps her activity level."  *Id.*  Although he could not say whether sedentary work would prevent all future flare-ups or exacerbations, he was of the opinion she could tolerate that level of activity.  Tr. 328.  He admitted that, even with sedentary activity, "Certainly maybe there would be good days and bad days, and unscheduled absences."  Tr. 328.

Taken as a whole, the ME's testimony established that Plaintiff's lupus impairment was a low-grade smoldering condition that was not following the typical course of exacerbations and remissions.  By its very nature, this refutes a "waxing and waning" impairment.  Plaintiff herself testified to experiencing an onset of symptoms at least four

27

times per week, requiring her to reduce her activities and rest to *prevent* a major flare-up.

Tr. 304-306.  That Plaintiff experienced good days and bad days does not establish a "wax

and wane" impairment.  *Perez*, 415 F.3d at 465.  The ALJ did not err in not making a

separate, explicit finding under *Frank*.

  Plaintiff further argues that she cannot perform her past relevant work on a regular

and continuing basis because she is bedridden four days every week and must constantly rest

to avoid flare-ups of her symptoms.  *Id*. 305.  The ALJ determined that this testimony was

an overstatement of Plaintiff's physical limitations.  The task of determining when subjective

complaints are credible is difficult and inherently imprecise.  Regulation 20 C.F.R. §

404.1529(c)(3) requires administrative adjudicators to conduct a seven-factor analysis when

determining credibility of a claimant's subjective complaints.  The adjudicator must compare

subjective testimony with certain objective factors, specifically:  (1) plaintiff's daily

activities; (2) location, duration, frequency and intensity of pain or other symptoms; (3)

precipitating and aggravating factors; (4) type, dosage, effectiveness and side effects of

medication taken to relieve pain or other symptoms; (5) treatment, other than medication,

undertaken to relieve pain or other symptoms; (6) any other measures used to relieve pain or

other symptoms; and (7) other factors concerning functional limitations and restrictions due

to pain or other symptoms.  20 C.F.R. § 404.1520(c)(3).  Under Social Security Ruling 96-7p,

administrative adjudicators are to make specific credibility findings regarding subjective

testimony in certain circumstances, and articulate reasons for discrediting the claimant's

subjective complaints when uncontroverted medical evidence shows a basis for a claimant's subjective complaints or the evidence otherwise clearly supports the plaintiff's application. *See Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988); *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).  Social Security Ruling 96-7p provides that,

> When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

The ALJ in the instant case followed these requirements and articulated reasons for not accepting the extent to which Plaintiff stated she was physically impaired.  He referenced Plaintiff's testimony that she can remain on her feet for twenty to thirty minutes before needing to rest, and that she can normally lift ten pounds.  He noted her participation in a family vacation to North Carolina, as well as her ability to drive a car, grocery shop, do laundry, dishes, and some cooking and housework.  He referenced her medical records, which indicated she appeared stable in February 1997, and that she reported doing very well without complaints in March 1997.  Her treatment notes dated June 15, 1998 indicated Plaintiff had no complaints and was doing well.  In her December 2004 treatment notes from M.D. Anderson Cancer Center, Plaintiff reported not having a flare-up for the past nine years.  Her September 2006 review of systems revealed that she was doing well.  A final medical report dated July 30, 2007, evinced she was asymptomatic.  Her medical records are

devoid of any recommendations by treating physicians that she restrict her physical activities. In short, no objective medical or other evidence in the record supports Plaintiff's subjective assertion of needing to remain in bed four days a week or needing to rest two hours for every one hour of any type of physical activity.

The ALJ's express and implicit findings that Plaintiff can perform her past relevant work on a regular and continuing basis are supported by substantial evidence in the record, and no error is shown.

### F.  Defendant's Arguments

Defendant asserts in his motion for summary judgment that the ALJ's decision should be affirmed because the ALJ properly determined Plaintiff was not under a disability. (Docket Entry No. 12.)

This Court recognizes the seriousness of Plaintiff's medical complaints.  However, the Court must review the record to determine only whether the ALJ's decision is supported by more than a scintilla, but less than a preponderance, of evidence.  *See Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).   The Court finds more than a scintilla of evidence in the instant case to support the ALJ's decision.  Therefore, the Court cannot overturn the decision of the ALJ, who is given the task of weighing the evidence and deciding disputes.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991).

For the reasons stated above, the Court finds that Defendant has satisfied his burden. Accordingly, the ALJ's decision finding Plaintiff not disabled is supported by substantial evidence in the record.  The Court also agrees with Defendant that the ALJ applied proper legal standards in evaluating the evidence and in making his determination.  Therefore, the Court **GRANTS** Defendant's motion for summary judgment (Docket Entry No. 11) and **AFFIRMS** the Commissioner's decision.

## IV.   CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant's motion for summary judgment (Docket Entry No. 11), **DENIES** Plaintiff's motion for summary judgment (Docket Entry No. 10), and **AFFIRMS** the Commissioner's decision.

The Clerk will provide copies to the parties.

Signed at Houston, Texas, on this the 25th day of March, 2010.

_____

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE